[Civ. No. 1447. Fourth Appellate District.—December 8, 1933.]

WADE H. FLIPPEN, Appellant, v. EARL R. ABBEY, as Administrator, etc., Respondent.

Drumm, Tucker, Martell & Drumm for Appellant.

W. F. Menton and Charles D. Swanner for Respondent.

BARNARD, P. J.—This is an action on a promissory note for $10,000 dated June 16, 1931, payable on or before six months from date with interest at eight per cent per annum. The note was executed by E. J. H. Primus, was payable to "myself" and was indorsed by Primus and delivered to one E. M. Hilton on the day it was made. On the same day a written agreement was executed by both Primus and Hilton providing that Hilton was to purchase 100,000 shares of stock of the Mammoth Mines Corporation from A. G. Mahan at twenty-five cents per share, which stock he was to resell and trade at $1 per share, and that Hilton was to sell the note and use the proceeds in furthering a campaign for the sale of the stock to be so purchased. Hilton agreed to pay the note from the first proceeds received from the sale of this stock and to return the paid note to Primus, it being further agreed that all profits arising from the sale of the stock should be divided between the two.

On July 1, 1931, Hilton indorsed and sold the note to one J. M. Horton, receiving $5,000 in cash with an agreement to pay Hilton an additional $2,500 if and when the note was collected. No part of this $2,500 was ever paid. Primus having died and an administrator having been appointed for

his estate, Horton filed a claim against the estate on December 22, 1931, and filed an amended claim on March 29, 1932. The claim was not allowed or approved by the administrator and, on May 25, 1932, Horton indorsed the note without recourse, and delivered it together with an assignment of his claim against the estate to Hilton, receiving from Hilton twelve shares of "Kettleman Hills Royalty No. 1." Hilton delivered the note and an assignment of the claim against the estate to the plaintiff and received $3,000 in cash, which he retained. This action followed and the plaintiff has appealed from a judgment in favor of the defendant.

In addition to the facts above given the court found that the agreement referred to was executed contemporaneously with the execution and delivery of the note; that no consideration was paid by Hilton; that Horton did not assign or transfer the note to the plaintiff; that Horton indorsed without recourse and assigned and delivered the note back to Hilton in consideration of certain oil stock; that Hilton thereafter and after maturity of the note, for a consideration of $3,000, transferred and delivered the note to the plaintiff, together with an assignment of the claim against the estate; that there was no privity of contract between Horton and the plaintiff but that the note and claim against the estate were on May 25, 1932, transferred from Horton to Hilton and, thereafter and after maturity of the note, transferred by Hilton to the plaintiff; that neither Primus nor his estate had received any consideration for the execution and delivery of the note and that Hilton retained all the consideration received from the sale of the note to Horton; and that the plaintiff, at the time he acquired the note and claim against the estate, took the same with full knowledge and notice that there was no consideration for its execution and that it had been obtained through fraud and misrepresentation.

 Most of the points raised by the appellant are based upon the theory that he holds the note free from any defenses since he purchased the same directly from Horton, who was an innocent purchaser for value before maturity and without notice, and that the findings to the effect that the note and claim were assigned by Horton

back to Hilton and then from Hilton to the appellant are not sustained by the evidence.

It may first be observed that even the position of Horton was not too secure since he purchased the note shortly after it was executed for much less than its face value after investigating the financial standing of the maker but without looking into the consideration given, when an investigation would have disclosed an agreement that the maker was not to pay the note (*Jordan* v. *Grover,* 99 Cal. 194 [33 Pac. 889]; *Witty* v. *Clinch,* 207 Cal. 779 [279 Pac. 797]).

The appellant relies on his own testimony that he purchased the note from Horton through Hilton acting as the agent of Horton, and Horton's testimony that he sold the note to the appellant and that Hilton made the sale as his agent. However, the record contains other evidence which, we think, supports the findings made. While Horton testified that Hilton told him he would try to sell the note for him and acted as his agent in selling the note to Flippen, he also testified that he made a written assignment of his claim against the estate and delivered it to Hilton; that he indorsed the note without recourse and delivered it to Hilton at the same time; that Hilton told him he had a purchaser for the note and asked him if he would accept from the proceeds of the sale ten shares of Kettleman Hills Royalty No. 1; that he told Hilton he would accept twelve shares of the oil stock as payment for the note and that Hilton could sell the same; that he delivered the note and assignment of his claim back to Hilton; that at the time he delivered these all he had was Hilton's word that he would receive twelve shares of oil stock; that about that time he received ten shares of the stock from Hilton and two months later he received the other two shares from Hilton; that he did not "remember" who had been the previous owner of this stock; that it was a "three-cornered deal"; that Hilton was to sell the note and he was to receive the shares of Kettleman Hills Royalty No. 1; and that Hilton asked him in Flippen's presence if he would be satisfied to receive twelve shares of oil stock "from the proceeds of the sale". The appellant testified that he received the note and assignment from his attorneys but did not know who delivered the same to them; that Hilton tried to sell him the note; that later on Hilton told him Horton wanted to

sell it; that he never owned any stock in the Kettleman Hills Royalty No. 1; that he paid $3,000 for the note; that the check was made payable to Hilton and was cashed; that Hilton at first told him it would take $3,800 to put through this three-cornered deal; and that he knew Hilton was to get the money he paid, he was to get the note and Horton was to get something but what it was he never knew. He also admitted that before purchasing the note he talked with the administrator of the estate and the attorney for the administrator and was told that the administrator was objecting to paying the note.

No explanation is offered as to how this could have been a simple sale from Horton to Flippen through the agency of Hilton and, at the same time, a three-cornered deal. There was no meeting of the minds between Horton and Flippen as neither ever knew what the other received or paid. Horton delivered the papers to Hilton, receiving something which Flippen had never owned and a part of which was not received until two months later. It is significant that the assignment of the claim against the estate which was executed by Horton was not introduced in evidence, and the only inference reasonably to be drawn from the whole evidence is that this assignment was made out to Hilton. Horton's testimony shows, at best, that he knew he was to receive only a part of the proceeds which Hilton was receiving for the note and that he neither knew nor cared what Flippen paid. It fully appears that Hilton was free to reduce the price of the note from $3,800 to $3,000 without consulting Horton. Hilton received the papers from Horton, obtained time for delivering the stock and then, after conducting his own negotiations with Flippen, delivered the note with an assignment of the claim, receiving and retaining the cash paid. A further consideration is that during all of the time Horton held the note an interest in the same to the extent of $2,500, if the same should be paid, was retained by Hilton, and Horton was hardly in a position to transfer the note to anyone other than Hilton without making proper provision for this phase of the matter, and, so far as the evidence shows, nothing was said to Flippen concerning the same. We think the evidence justified the court in finding, as testified to by both Flippen and Horton,

that this was a "three-cornered" deal and not one between Flippen and Horton alone and that, with the reasonable inferences therefrom, it fully supports the findings to the effect that the note was transferred back to Hilton and by him later transferred to Flippen.

■ The appellant contends that the record contains no evidence of any breach of Hilton's agreement with the maker of the note and, therefore, the respondent has failed to establish any defense even as against Hilton. It is argued that the court removed the only evidence of a breach of this agreement when it struck out certain testimony given by Mahan, from whom Hilton agreed to purchase the stock for the promotion of the sale of which the note was given. Mahan had testified that Hilton never bought any stock from him. While the record shows that the court erroneously struck out this testimony and also erred in shutting out considerable other evidence offered by the respondent, we think it sufficiently discloses a defense to the note as against Hilton. So long as he was the owner of the note he was bound by his agreement that it was not to be paid by the maker but was to be paid by him from the proceeds of certain stock which he was to buy and sell, and was by him to be returned to the maker. It appears that this was not done and that Hilton himself could not recover as against the maker and the appellant is in no better position since he bought the note from him after maturity and in fact with notice. While not material, it is not without significance that the appellant bought the note after maturity for about one-fourth of its face value, after being told that payment would be contested and after making inquiry of his lawyers as to whether "it was legal".

Questionable circumstances appear in connection with every phase of these transactions and indications of collusion are not absent, all of which may have had its influence on the trial court in reaching a conclusion as to the truth of various portions of the evidence.

The views already expressed make it unnecessary to consider the other points raised.

The judgment is affirmed.

Marks, J., and Jennings, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 5, 1934.